**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

CENTER FOR BIOLOGICAL DIVERSITY,
378 N. Main Avenue
Tucson, AZ 85701,

       Plaintiff,

v.

EUGENIO PIÑEIRO SOLER, in his official
capacity as Director of NOAA Fisheries,
1315 East-West Highway
Silver Spring, MD 20910,

NATIONAL MARINE FISHERIES SERVICE,
1315 East-West Highway
Silver Spring, MD 20910,

and

HOWARD LUTNICK, in his official capacity
as Secretary of Commerce,
1491 Constitution Avenue NW
Washington, D.C. 20230,

       Defendants.

Civil Action No.: 26-cv-1831

**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**

## INTRODUCTION

1. Plaintiff, Center for Biological Diversity ("the Center"), challenges the unlawful decision of the National Marine Fisheries Service ("NOAA Fisheries"), to deny Endangered Species Act ("ESA") protection to the Atlantic (or American) horseshoe crab (*Limulus polyphemus*) ("Horseshoe Crab").

2. The Horseshoe Crab is one of the oldest living species on Earth, with fossils dating back as far as 450 million years ago. Horseshoe Crabs are often referred to as living fossils and have persisted through the ages. Until they met humans.

1



*Photo: Gregory Breese, U.S. Fish and Wildlife Service*

3.      Adult Horseshoe Crabs inhabit shallow estuarine areas and offshore habitats near the continental shelf. Their range spans the Atlantic Coast from northern Maine to Florida, the Gulf Coast from Florida to Louisiana, and the Yucatán Peninsula.

4.      A variety of threats are pushing Horseshoe Crabs to the brink of extinction: industry overharvesting to use the crabs as bait or to drain their blood; housing development, pollution, and erosion that destroys spawning beaches; and climate change and sea level rise. In the past three decades, Horseshoe Crab numbers have dropped to historic lows and their habitat is disappearing. Since the 1990s, the Delaware Bay Horseshoe Crab population has fallen by two-thirds. Other populations across the species' range have experienced similar declines.

5.      Responding to these threats, the Center petitioned NOAA Fisheries to list the species as threatened or endangered under the ESA.

6.      On February 18, 2026, NOAA Fisheries denied the petition, along with a petition submitted by Friends of Animals. The agency published in the Federal Register a 90-day finding

2

that "the petitions do not present substantial scientific or commercial information indicating" that listing the Horseshoe Crab under the ESA is warranted. 91 Fed. Reg. 7448 (Feb. 18, 2026).

7.      The 90-day finding is the threshold first step in NOAA Fisheries' review of an ESA listing petition; it must issue a positive finding if the petition demonstrates that listing *may* be warranted. Only upon issuance of a positive 90-day does the agency then undertake a comprehensive status review to determine if, based on the best available scientific information, listing *is* warranted. Yet here, NOAA Fisheries' negative 90-day finding made in essence a 12-month finding, but without the agency first performing a species status review and providing all interested parties with procedural opportunities that accompany a 12-month review and finding.

8.      NOAA Fisheries' negative 90-day finding is arbitrary, capricious, and unlawful because: (i) the agency applied an improperly heightened standard in evaluating the petitions, including by dismissing and disregarding the petitions' credible evidence; (ii) the agency impermissibly went beyond the four corners of each petition and relied on third-party information for the 90-day finding, and (iii) the agency arbitrarily determined that there was no significant portion of the Horseshoe Crab's range where listing may be warranted.

9.      The Center brings this action against Defendants NOAA Fisheries; Eugenio Piñeiro Soler, in his official capacity as Director of NOAA Fisheries; and Howard Lutnick, in his official capacity as Secretary of Commerce, to remedy violations of the ESA, 16 U.S.C. §§ 1531–1544, under the Administrative Procedure Act's ("APA") standard of review. The Center challenges the unlawful finding that the petitions did not provide substantial information indicating that listing the Horseshoe Crab as threatened or endangered may be warranted.

10.     The Center asks this Court to declare the Defendants have violated the ESA. The Center also seeks an order vacating and remanding the negative 90-day finding with an order to make a new 90-day finding that applies the requisite standards by a date-certain.

3

**JURISDICTION AND VENUE**

11.     Plaintiff brings this action pursuant to the ESA citizen suit provision, 16 U.S.C. § 1540(g), and the APA, 5 U.S.C. § 702, which waive Defendants' sovereign immunity.

12.     This Court has jurisdiction pursuant to 28 U.S.C. § 1331 (federal question jurisdiction); 28 U.S.C. §§ 2201–2202 (declaratory judgments and further relief); 16 U.S.C. § 1540(c) (district court jurisdiction); 16 U.S.C. § 1540(g)(1)(C) (action arising under the ESA citizen-suit provision); and 5 U.S.C. §§ 702–704 (APA).

13.     Venue is proper in this Court pursuant to 16 U.S.C. § 1540(g)(3)(A) and 28 U.S.C. § 1391(e), as this civil action is brought against an agency of the United States and officers and employees of the United States acting in their official capacities and under the color of legal authority, and because no real property is involved in this action. Defendant Lutnick resides, and Plaintiff the Center maintains an office, in this judicial district.

**PARTIES**

14.     Plaintiff CENTER FOR BIOLOGICAL DIVERSITY is a national non-profit conservation organization with over 101,611 members, including many who live and recreate in the Horseshoe Crab's range. The Center works through science, law, and creative media to secure a future for all species, great and small, hovering on the brink of extinction, with a focus on protecting the lands, waters, and climate that species need to survive. Center headquarters are in Tucson, Arizona, and the Center has offices across the United States, including Washington, D.C.

15.     The Center brings this action on behalf of its members who maintain professional, scientific, aesthetic, recreational, and other legally protected interests in the Horseshoe Crab and its habitat and rely on the Center to protect these interests.

16.     Center member Rob Gough, who lives in Massachusetts' North Shore, regularly recreates in Horseshoe Crab habitat and enjoys searching for and observing Horseshoe Crabs.

His affinity for Horseshoe Crabs runs deep—his earliest memories from growing up in Cape May, New Jersey, are of walking the beach in the spring, observing Horseshoe Crabs who have come ashore to spawn, and helping turn over the crabs who were stuck upside down on the beach. He fondly remembers frequenting Reed's Beach on the Delaware Bay shore, seeing thousands of Horseshoe Crabs along the sandy beach, along with ribbons of beautiful turquoise Horseshoe Crab eggs on the tide line providing food for hungry shorebirds. Mr. Gough was initially drawn to how the Horseshoe Crabs' annual appearance on beaches provided a glimpse into a species that was otherwise a mysterious creature of the deeper ocean. As he grew older, he also came to appreciate Horseshoe Crabs on multiple other levels. He is amazed that the species has outlived dinosaurs and survived ice ages. As Mr. Gough took up birding as a hobby and observed how shore birds like the red knot and ruddy turnstone depend on the crabs' eggs as a vital food source to fuel their long-distance migrations, he realized that Horseshoe Crabs are a prime example of a keystone species in the ecosystem where he spent, and continues to spend, so much of his time recreating.

17.     Mr. Gough continues to visit Horseshoe Crab habitat to search for and encounter Horseshoe Crabs. Beginning in early May, he and his wife head to the Great Marsh area of Massachusetts—including shorelines of Plum Island and Ipswich—to look for shorebirds and Horseshoe Crabs every spring weekend. He is taking these weekend beach visits this year and has plans to continue them next year, the year after, and on and on. Mr. Gough also still visits family in south New Jersey at least once a year, and during those trips he will walk the beach and look for Horseshoe Crabs. Occasionally, when encountering a Horseshoe Crab, he gets the thrill of discovering the crab has previously been tagged, suggesting that the crab had come ashore to spawn in a past year. Horseshoe crabs have become an important part of Mr. Gough's sense of place—sparking memories of thrilling wildlife experiences from his past, marking the heart of

the spring season each year, and helping to give unique meaning to the outdoor spaces he considers part of his home. But as Mr. Gough grows older, he also finds the spring beach visits disheartening in that he sees fewer and fewer crabs each year. Despite this distress, Mr. Gough will continue to visit the beaches that host Horseshoe Crabs and has no plans to stop looking for them. His recreational and aesthetic interests in the Horseshoe Crab, its habitat, and the shorebird species its eggs feed are harmed by NOAA Fisheries decision not to provide ESA protections for the Horseshoe Crab because the decline and potential loss of the species hurt his enriching natural encounters and his joy in sharing these encounters with his wife and family.

18.    Center member Susan Linder is a conservation wildlife biologist based in New Jersey committed to and focused solely on the conservation of Horseshoe Crabs and the protection of the marine and coastal ecosystems they live in. She has been working with Horseshoe Crabs for over eleven years in a variety of ways: performing spawning surveys, rescuing stranded and overturned Horseshoe Crabs, tagging Horseshoe Crabs for tracking purposes, and conducting surveys of Horseshoe Crab eggs on beaches throughout the species' habitat. An employee of Wildlife Restoration Partnerships, Ms. Linder works as part of the Horseshoe Crab Recovery Coalition. Each year, she conducts Horseshoe Crab egg abundance surveys herself for six consecutive weeks and oversees egg surveys performed in other geographic areas along the Atlantic coast in the spring; analyzes the egg survey data and prepares detailed reports for state agencies during the summer; works on projects restoring beaches for Horseshoe Crab habitat during the winter months; and educates the public on Horseshoe Crabs throughout the year, such as by setting up a table at multiple Horseshoe Crab festivals and events, including the Smithsonian National Zoo's Delaware Bay exhibit on International Horseshoe Crab Day. She is also a volunteer with "Return the Favor," through which people become trained and certified in handling Horseshoe Crabs so that they can rescue Horseshoe

6

Crabs who become stuck upside-down or impinged on beaches; without someone flipping them over, the Horseshoe Crabs will die. As a volunteer with Return the Favor, Ms. Linder not only rescues Horseshoe Crabs on her own, but for the last three years also has led members of the public on rescue walks and sponsors beaches. In short, Ms. Linder works on projects to support and recover the Horseshoe Crab every day of the year—including holidays and weekends— because, to her, it is not work but rather an honor to aid the species. She thrills to see even depictions of Horseshoe Crabs in unexpected places—for example, when she took at class at Stockton University, she was excited to come across a mural of a Horseshoe Crab in the parking garage. As long as she is alive, Ms. Linder plans to continue Horseshoe Crab research and protection efforts. She is encountering Horseshoe Crabs along Delaware Bay beaches this spawning season and has plans to continue encountering them next year, and every year after.

19.    Ms. Linder has a deep emotional and aesthetic attachment to Horseshoe Crabs. She lives for the spawning season, when Horseshoe Crabs arrive on the beach, laying eggs, and people are walking the beach to flip Horseshoe Crabs and help them return to safety in the water. Ms. Linder believes that during these magical weeks, all is right with the world. In a related fashion, she is harmed when she notices fewer Horseshoe Crabs and Horseshoe Crab eggs. For example, when surveying Horseshoe Crab eggs she discovers that egg density levels are lower than expected—such as this year, when the first two weeks of surveying found Horseshoe Crab egg levels to be the second lowest in her eleven-year dataset—she is devastated. Ms. Linder's recreational, aesthetic, emotional, and professional interests are harmed by NOAA Fisheries' decision not to list the Horseshoe Crab as threatened or endangered because the decline and potential loss of the species reduce the quantity and quality of her experiences with the species.

20.    NOAA Fisheries' denial of ESA protection for the Horseshoe Crab has caused Mr. Gough, Ms. Linder, and other Center members to suffer a concrete and particularized injury that

is actual and imminent. A species does not receive any protection under the ESA until it is listed as endangered or threatened. Without ESA protection, the Horseshoe Crab is likely to continue its decline to extinction. The Center's members' injuries will persist unless the Court grants the relief sought in this Complaint.

21.    Defendant EUGENIO PIÑEIRO SOLER is the Director of NOAA Fisheries and is charged with ensuring that agency decisions comply with the law. The Center sues Defendant Soler in his official capacity.

22.    Defendant NATIONAL MARINE FISHERIES SERVICE is a federal agency within the Department of Commerce. The Secretary of Commerce has delegated to NOAA Fisheries the authority to administer the ESA for marine species. *See* 50 C.F.R. § 402.01(b).

23.    Defendant HOWARD LUTNICK is the Secretary of Commerce and has the ultimate responsibility to administer and implement the provisions of the ESA. The Center sues Defendant Lutnick his official capacity.

## STATUTORY AND REGULATORY BACKGROUND

### The Endangered Species Act.

24.    Congress enacted the ESA to "provide a program for the conservation of . . . endangered species and threatened species" and "to provide a means whereby ecosystems upon which endangered species and threatened species depend may be conserved." 16 U.S.C. § 1531(b).

25.    The ESA requires that "all Federal departments and agencies . . . seek to conserve endangered species and threatened species and . . . utilize their authorities in furtherance of the purposes" of the ESA. *Id.* § 1531(c)(1).

26.    Species are afforded protection under the ESA only if the Secretary—who has delegated his authority to NOAA Fisheries or the U.S. Fish and Wildlife Service—lists the

species as threatened or endangered. A species is "endangered" if it "is in danger of extinction throughout all or a significant portion of its range." *Id.* § 1532(6). A species is "threatened" if it "is likely to become an endangered species within the foreseeable future throughout all or a significant portion of its range." *Id.* § 1532(20).

27. Any person may petition NOAA Fisheries to list a species under the ESA. *Id.* § 1533(b)(3)(A). To the maximum extent practicable, within 90 days after receiving a petition to list a species as threatened or endangered, NOAA Fisheries "shall make a finding as to whether the petition presents substantial scientific or commercial information indicating that the petitioned action *may* be warranted." *Id.* (emphasis added). This finding stage is a "threshold determination" with "less searching review." *Colo. River Cutthroat Trout v. Kempthorne*, 448 F. Supp. 2d 170, 176 (D.D.C. 2006). This stage is commonly referred to as a "90-day finding."

28. At the 90-day finding stage, the question is whether a "reasonable person" can believe "that the measure proposed in the petition may be warranted." *Humane Soc'y of the U.S. v. Pritzker*, 75 F. Supp. 3d 1, 10 (D.D.C. 2014). "It follows that the standard requiring consideration of whether a 'reasonable person' would conclude that action 'may be warranted' contemplates that where there is disagreement among reasonable scientists, the Service should make a 'may be warranted' finding." *Buffalo Field Campaign v. Zinke*, 289 F. Supp. 3d 103, 109-110 (D.D.C. 2018) (quotation omitted).

29. If NOAA Fisheries makes a positive 90-day finding that "the petitioned action may be warranted," it must promptly publish that finding in the Federal Register and "promptly commence a review of the status of the species concerned." 16 U.S.C. § 1533(b)(3)(A). When "a private citizen petitions the Secretary to list a species, and presents substantial evidence in support of the petition, the Secretary is required to conduct a review of the species." H.R. Rep. No. 95-1625, at 5. The review step following a 90-day finding is commonly referred to as a

9

"status review." In that review process, NOAA Fisheries publishes notice of a status review in the Federal Register, sends notice in writing to the relevant state agencies in any affected state, and invites comments from all interested parties. 50 C.F.R. § 424.15.

30.    In a status review, NOAA Fisheries must determine whether the species is threatened or endangered because of any of the following factors: (A) the present or threatened destruction, modification, or curtailment of its habitat or range; (B) overutilization for commercial, recreational, scientific, or educational purposes; (C) disease or predation; (D) the inadequacy of existing regulatory mechanisms; or (E) other natural or manmade factors affecting its continued existence. 16 U.S.C. § 1533(a)(1).

31.    If a species meets the definition of threatened or endangered because it is imperiled by any one or a combination of these five factors, NOAA Fisheries must list the species. *Id.*; 50 C.F.R. § 424.11(c).

32.    Following its completion of the status review, and within 12 months of receiving the petition, NOAA Fisheries must publish one of three findings: (1) listing is "warranted," (2) listing is "not warranted," or (3) listing is "warranted but precluded" by other pending proposals to list species, provided certain circumstances are met. 16 U.S.C. § 1533(b)(3)(B). This is commonly referred to as a "12-month finding."

33.    If NOAA Fisheries issues a 12-month finding that listing the species is "warranted," it must publish a proposed rule to list the species as endangered or threatened in the Federal Register, invite comments from interested parties, and hold a public hearing if requested. *Id.* § 1533(b)(4)-(5). Within one year of publishing a proposed rule to list a species, the agency must, with limited exceptions, issue a final rule listing the species and designating critical habitat for it. *Id.* § 1533(a)(3), (b)(6)(A), (C).

34.    In evaluating a petition to list a species, NOAA Fisheries must examine whether the species is threatened or endangered throughout all its range, as well as whether species is threatened or endangered in any significant portion of that range. *Id.* § 1532(6), (20).

### The Administrative Procedure Act.

35.    Under the APA's standard of review, a court must hold unlawful and set aside agency action found to be "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," or found to be "without observance of procedure required by law." 5 U.S.C. § 706(2)(A), (D). This standard of review applies to claims brought under the citizen suit provision of the ESA.

36.    Agency action is arbitrary and capricious if the agency "entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Motor Vehicle Mfrs. Ass'n, Inc. v. State Farm Mut. Auto Ins. Co.*, 463 U.S. 29, 43 (1983) ("*State Farm*").

## FACTUAL BACKGROUND

### The American (or Atlantic) Horseshoe Crab.

37.    Horseshoe Crabs (*Limulus polyphemus*) are animals with green olive or brown coloration and primitive body structure consisting of the prosoma (head), opisthosoma (central area), and telson (tail). The species at issue here—known as the American or Atlantic horseshoe crab—is distinct from other horseshoe crab species, which have the scientific names *Tachypleus tridentatus*, *Tachypleus gigas*, and *Carcinoscorpius rotundicauda*.

38.    Horseshoe Crabs are related to sea spiders, spiders, scorpions, ticks, and mites.

39.    Horseshoe Crabs possess ten eyes, which equip them with the ability to see both during the day and at night and to evaluate the intensity of visual and ultraviolet light.

11

40.     Horseshoe Crabs reach sexual maturity for spawning somewhere between 9 to 12 years of age. Horseshoe Crabs come ashore for spawning on beaches in late spring each year. This spawning aggregation is one of the oldest recurring migrations in the world. In warmer waters, Horseshoe Crabs maintain year-round activity, but in cooler northern waters, they burrow into the mud and become inactive during the winter.

41.     Two separate industries have landed a powerful one-two punch to Horseshoe Crab numbers over the past several decades. Industry harvesting of Horseshoe Crabs (i) to use as bait for eel and whelk fishing, and (ii) to collect the crabs' blood for biomedical testing have been decimating Horseshoe Crab populations.

42.     The species suffered population collapse beginning in the 1990s. During this time span, the crabs in Delaware Bay fell by two-thirds. Other populations along the Atlantic Coast and in the Gulf of Mexico have seen similar declines. These populations have not recovered.

43.     Horseshoe Crab spawning has also decreased sharply. For example, between 1990 and 2002, the number of Horseshoe Crabs spawning in Delaware Bay dropped from more than 1.2 million to 333,500 crabs—a decrease of 72 percent. The number of spawning Horseshoe Crabs has remained at that low number, with only 335,211 spawning in Delaware Bay in 2020.

44.     Horseshoe Crab egg densities on spawning beaches have declined by an order of magnitude across their range.

45.     The species suffers habitat loss from coastal reclamation and coast development.

**Listing History.**

***The Petition to List the Horseshoe Crab.***

46.     On February 27, 2024, in effort to halt the Horseshoe Crab's continued decline, the Center and 25 organizations petitioned NOAA Fisheries ("Center petition") to list the Horseshoe Crab (*Limulus polyphemus*) as a threatened or endangered species under the ESA.

47.    The Center petition provided substantial information showing that listing the Horseshoe Crab may be warranted—either across the species' entire range or in significant portions of it.

48.    For example, the Center provided the International Union for the Conservation of Nature's ("IUCN") most recent "Red List" assessment of the Horseshoe Crab, which at the time of the petition (and still today) categorizes the species as vulnerable and facing a high risk of extinction in the wild. The IUCN Red List "is a powerful tool" that "provides information about range, population size, habitat and ecology, use and/or trade, threats, and conservation actions that will help inform necessary conservation decisions." *See* IUCN, "Background & History," available at https://www.iucnredlist.org/about/background-history (last accessed Apr. 23, 2026).

49.    The petition also referenced the IUCN's most recent "Green Status" of Horseshoe Crabs, which "complements the Red List by providing a tool for assessing the recovery of species' populations and measuring their conservation success." *See* IUCN, "The IUCN Green Status of Species," available at https://www.iucnredlist.org/about/green-status-species (last accessed Apr. 23, 2026). The petition noted that the IUCN Green Status Assessment for Horseshoe Crabs concludes that habitat loss and climate change threaten the horseshoe crab across the entirety of its range, and the species has a zero chance of recovery in the next century.

50.    The Center petition also referenced NOAA Fisheries' own *NOAA Fisheries Vulnerability Assessment on the Northeast U.S. Continental Shelf*, which characterizes the vulnerability of the Horseshoe Crab as "very high."

51.    In addition to the range-wide identifications of the species' vulnerability, the Center provided substantial information demonstrating regional declines. The petition identified

13

six regional metapopulations[1] and provided information about how each such metapopulation is depleted, facing multiple threats, and warrants listing as threatened or endangered.

52.     For example, the petition provided what NOAA Fisheries acknowledged were "recent studies" showing continued population declines in Delaware Bay and South Carolina.

53.     For Delaware Bay, the petition described Garmoe et al. (2021) and Virginia Tech trawl surveys as showing decreases in high-density spawning events and adult female horseshoe crabs, both of which are essential for continued Horseshoe Crab survival and recovery. The petition also showed Horseshoe Crab egg density in Delaware Bay (i.e., the number of eggs per square meter of beach) declining by an order of magnitude since the 1980s.

54.     For South Carolina, the Center petition referenced Hunt (2022), which in turn cited a variety of data sources—from sightings of tagged Horseshoe Crab to egg density measurements—showing Horseshoe Crab declines.

55.     In addition to these two studies, the petition cited quantitative analyses in studies showing steep population declines in the Gulf of Maine, Mid-Atlantic, Southeast, Florida Atlantic, Northeast Gulf of Mexico, and Yucatán regions.

56.     The Center petition included substantial information showing the myriad, varied threats driving the Horseshoe Crab's decline. These threats include, among others:

- Direct killing from industry harvests of crabs to use as bait or for biomedical purposes;

- Sublethal effects, including impaired breeding, from draining the crabs' blood for biomedical use;

- Habitat loss from development on, or next to, spawning beaches;

- Habitat loss from climate change;

---

[1] The Center petition identified "six discrete American horseshoe crab metapopulations based on genetics, morphology, behavior, and geographic diversity: Gulf of Maine, Mid-Atlantic, Southeast, Florida Atlantic, Northeast Gulf of Mexico, and Yucatán units."

14

- Direct crab killing as other fisheries' bycatch;

- Direct crab killing and altered habitat from algal blooms (also known as red tides);

- Direct crab killing and altered habitat from oil spills; and

- Direct crab killing and altered habitat from power plant impingement and dredging.

57.    The Center also described how biomedical industry harm to Horseshoe Crabs is likely to increase because the other horseshoe crab species whose blood is tapped for biomedical purposes—the Asian horseshoe crab species—have drastically declined in numbers. Indeed, NOAA Fisheries acknowledged that the Center petition "provide[s] a reasonable assumption that demand for LAL [the biomedical agent derived from Horseshoe Crab blood for endotoxin testing] could increase in the coming decades. . . ."

58.    In the face of range-wide and region-specific population declines and the ongoing and increasing threats to the Horseshoe Crab and its habitat, there are inadequate regulatory mechanisms to protect the species. The Center petition showed: that there are no regulatory protections in the United States outside of the Atlantic States Marine Fisheries Commission ("ASMFC"); that the ASMFC's restrictions on harvesting offer insufficient coverage of the threats to the species; and that the ASMFC regulatory framework suffers fatal data flaws. The petition also provided information about how Mexico's regulations fail to stanch the decline of the depleted Horseshoe Crab population in the Yucatán.

### *NOAA Fisheries' Response to the Petitions.*

59.    Because NOAA Fisheries did not publish a 90-day finding before its statutory deadline, the Center sued NOAA Fisheries for failing to meet the deadline. *See* Compl., *Ctr. for Biological Diversity v. Nat'l Marine Fisheries Serv., et al.*, 1:26-cv-00008-RDM (D.D.C.) (filed Jan. 5, 2026). The lawsuit sought an order compelling the agency to issue a 90-day finding by a date certain. *Id*. at 9.

60.     Before responding to the deadline lawsuit, NOAA Fisheries issued a 90-day finding on the Center petition and a second listing petition by Friends of Animals. 91 Fed. Reg. 7448 (Feb. 18, 2026). In it, the agency found that the petitions did not provide substantial information indicating that listing the Horseshoe Crab may be warranted. *Id*.

**The Challenged Agency Action: NOAA Fisheries' Negative 90-day Finding.**

61.     NOAA Fisheries' negative 90-day finding acknowledged that estimates of Horseshoe Crab abundance range-wide or regionally do not exist. Instead, the finding relied on "the status and trends of regional populations have been described quantitatively or qualitatively based on data collected from various mechanisms (*e.g.*, fishery independent surveys, spawning and tagging studies, recruitment rates) over the last 30 or more years."

62.     NOAA Fisheries' assessment process disregarded credible studies and data from the petitions, chose its own preferred studies and reports over those disregarded materials, and relied on many materials outside of the petitions.

63.     NOAA Fisheries also made some findings as to the Horseshoe Crab's status in a "significant portion of its range." In one part of the 90-day finding, the agency separated the Horseshoe Crab range into eight regional population units, which generally tracked but was not identical to the six regional metapopulations from the Center petition: Maine (northern Maine, Hog Bay); Gulf of Maine (southern Maine to New Hampshire); Mid-Atlantic (Massachusetts to North Carolina); Southeast (South Carolina to Georgia); Florida-East (Indian River, Florida-Atlantic); Florida-South (Biscayne Bay, Florida-Atlantic); Florida-Gulf; and Yucatán Peninsula, Mexico.

64.     Elsewhere in the 90-day finding, the agency further separated the Mid-Atlantic regional population into subregions: Mid-Atlantic New England (southern New Hampshire to

Rhode Island) (also referred to as "Mid-Atlantic Northeast"); Mid-Atlantic New York (Connecticut to New York); and Mid-Atlantic Delaware Bay (New Jersey to Virginia).

65.    NOAA Fisheries concluded that the Mid-Atlantic New York regional population was declining but that the region was not a significant portion of the Horseshoe Crab's range. The agency also concluded that Delaware Bay itself may be a significant portion of the range, and that there is no substantial information showing that the Mid-Atlantic Delaware Bay regional population should be listed.

66.    Based on its conclusions that most regional populations are stable or increasing with the exception of the Mid-Atlantic New York regional population, and its finding that nothing supports the Mid-Atlantic New York regional population as a significant portion of the species' range, NOAA Fisheries concluded that the petitions do not present substantial scientific or commercial information indicating that listing the Horseshoe Crab as threatened or endangered may be warranted.

### *NOAA Fisheries applied an improperly heightened standard for a 90-day finding and disregarded credible evidence.*

67.    As described in paragraphs 46-58 & n.1, above, the Center petition provided substantial scientific and commercial information indicating that listing the Horseshoe Crab as threatened or endangered under the ESA is warranted. That substantial information should end the matter, leading NOAA Fisheries to make a positive 90-day finding and begin a status review.

68.    The language of the ESA makes clear that at the 90-day finding stage, the agency must not subject a petition to critical review. 16 U.S.C. § 1533(b)(3)(A) (if a "petition presents substantial scientific or commercial information that the petitioned action may be warranted . . . the Secretary shall promptly commence a review of the status of the species concerned").

69.    In making its negative 90-day finding for the Horseshoe Crab, in several instances NOAA Fisheries picked a side in an ongoing debate in the scientific community. By selecting a

17

side in the scientific disputes, NOAA Fisheries disregarded and dismissed credible scientific and commercial information from the petitions.

70.     For example, the Center petition identified two recent studies showing Horseshoe Crab declines in Delaware Bay and South Carolina—the Garmoe et al. (2021) and Hunt (2022) studies, respectively. NOAA Fisheries did not reject these studies as lacking credibility. Instead, it favored other studies which disagreed with Garmoe et al. (2021) and Hunt (2022) about the Delaware Bay and Southeast regional population trends.

71.     One study that NOAA Fisheries favored over Garmoe et al. (2021) was a report from the ASMFC from 2024, which was issued *after* the Center submitted its petition—NOAA Fisheries was not permitted to consider this post-petition report, and the Center could not possibly have addressed it.

72.     For another example, NOAA Fisheries acknowledged that the Center provided information showing "it is reasonable to expect that decline in [amebocyte lysate from Asian horseshoe crabs] could shift the world-wide demand for amebocyte lysate to the Atlantic" horseshoe crab, thus increasing the harvest of Horseshoe Crabs for biomedical purposes. But the agency then dismissed this credible information by relying on other materials speculating that a synthetic alternative to Horseshoe Crab blood "could stem this demand."

73.     NOAA Fisheries also disregarded credible information in the Center petition regarding the rate which the biomedical industry kills Horseshoe Crabs as part of the bleeding process. The Center presented (i) a scientific study which showed a 30 percent death rate for Horseshoe Crabs drained of blood for biomedical purposes, and (ii) a study of sub-lethal effects of blood draining that found that bled crabs mated less after release to the ocean. In the negative 90-day finding, NOAA Fisheries instead chose to rely on other studies suggesting a 15 percent mortality rate from the biomedical blood-draining process and to dismiss the sub-lethal effects

18

study in its entirety. NOAA Fisheries disregarded the studies finding 30 precent mortality and sub-lethal effects, but not because it found them to lack credibility. Instead, the agency claimed to disregard the studies because they did not follow best management practices developed by ASMFC and biomedical companies in 2011. However, elsewhere in the negative 90-day finding, NOAA Fisheries acknowledged that these best management practices "are not regulatory" and that only "some" biomedical companies follow them.

74.    For yet another example, the Center petition provided "two expert reviews" from 2022 (Lipcius and Shoemaker) that showed the ASMFC's regulatory scheme is based on flawed data causing inflated population estimates and trends. NOAA Fisheries did not find these expert reviews lacked credibility, but instead relied on the ASMFC's subsequently generated 2024 "technical responses to the comments received by Lipcius (2022) and Shoemaker (2022)." NOAA Fisheries gave the last word in this scientific debate to the ASMFC, even though the ASMFC's 2024 response post-dated the Center's petition. NOAA Fisheries was not permitted to consider this post-petition information, and the Center could not possibly address it.

75.    These examples are illustrative and not comprehensive. NOAA Fisheries picked sides in scientific debates and disregarded the Center petition's credible information throughout the negative 90-day finding.

76.    By resolving scientific disputes and selecting favored information over other credible information that a reasonable person might rely on, NOAA Fisheries applied an improperly heightened standard to make its negative 90-day finding. These errors render the negative 90-day finding arbitrary, capricious, and contrary to law.

### *NOAA Fisheries unlawfully relied on third-party materials that went far beyond the four corners of the Center petition.*

77.    In making the 90-day finding, NOAA Fisheries relied on a large number of third-party materials that were not part of the Center petition.

78.    The "References Cited" list for the 90-day negative finding includes 152 unique references.

79.    Of those 152 unique references, nearly one-third—48 references—were neither cited in the Center (or Friends of Animals) petition, nor authored by NOAA Fisheries.

80.    These external-to-the-petitions sources included data and reports from the ASMFC, including ASMFC materials that post-date the petitions. For example, the negative 90-day finding heavily relies on: (i) a 2024 ASMFC horseshoe crab stock assessment update; (ii) a 2024 ASMFC review of the 2023 fishing year, and; (iii) ASMFC's "Technical Response to External Review of the 2022 ARM Framework Revision." All three ASMFC documents were created *after* the Center submitted its petition.

81.    Other ASMFC-created documents relied upon in the negative 90-day finding that were not in the petitions included reports and materials from 2009, 2013, 2021, and 2023.

82.    NOAA Fisheries does not typically keep ASMFC materials on Horseshoe Crabs in its files. On June 5, 2023, the Center submitted a Freedom of Information Act request to NOAA Fisheries for the ASMFC's "2019 Horseshoe Crab Benchmark Stock Assessment and Peer Review Report," all records associated with the report, and all "subsequent reports." NOAA Fisheries responded to the Center on August 2, 2023, that "[a]fter searching our files we were unable to locate any records that are responsive to your request."

83.    The negative 90-day finding also cites third-party state data, including state reports submitted to the ASMFC in 2024. As with the 2024 ASMFC documents, these state reports were created *after* the Center and Friends of Animals submitted their petitions.

84.    In addition to state reports to the ASMFC, NOAA Fisheries relied on a variety of South Carolina materials about Horseshoe Crabs that were not included in the Center's petition. These included three documents from 1999 related to the study of Horseshoe Crab mortality

from biomedical bleeding, a 2012 report for South Carolina's Sea Grant Consortium, and a 2017 evaluation of best management practices for bleeding crabs for biomedical purposes.

85. NOAA Fisheries also relied on third-party documents outside of the petitions to analyze the issue of bleeding Horseshoe Crabs for biomedical purposes. In addition to the South Carolina materials referenced above, NOAA Fisheries also relied on Smith et al. (2020), Rudloe (1983), and Owings et al. (2019) and (2020) regarding biomedical bleeding effects. None of these materials were in the petitions.

86. NOAA Fisheries also relied on unpublished records from Dr. Lawrence Niles. The negative 90-day finding "References Cited" list includes a declaration Dr. Niles submitted in a federal court lawsuit against U.S. Fish and Wildlife Service and Charles River Laboratories. It also includes a 2021 letter Dr. Niles and two of his colleagues submitted to ASMFC. Neither document was included in the Center or Friends of Animals petitions.

87. Because NOAA Fisheries considered and relied on these many extra-petition materials for the negative 90-day finding, the Center could not address the materials or NOAA Fisheries' analyses of the materials. The Center will be able to address all third-party materials if NOAA Fisheries performs its comprehensive information collection and analysis at the appropriate stages in ESA listing proceedings—the status review and 12-month finding stages.

88. The Horseshoe Crab negative 90-day finding shows how the ESA listing process malfunctions when an agency considers materials outside the four corners of the petitions. For example, NOAA Fisheries responded to the Center's demonstration of depleting Horseshoe Crab populations by citing a 2024 assessment of the Northeast regional population from ASMFC, which post-dates the Center petition. NOAA Fisheries then stated that "when the complete set of available data is considered, there has been improvement in the population status and trends of regional populations from New Hampshire to Florida-Atlantic, with the exception of New York;

*the petitions do not present this information.*" 91 Fed. Reg. 7451 (emphasis added). In other words, NOAA Fisheries found the Center (and Friends of Animals) did not offer substantial information that listing may be warranted because their petitions failed to present third-party information that did not even exist when the petitions were submitted. NOAA Fisheries stated this at the 90-day stage, when the Center had no knowledge or expectation that NOAA Fisheries was considering new information, nor the opportunity to address the new information.

89. Had NOAA Fisheries instead performed a 12-month status review and finding, the agency would have been obligated to invite and consider public comment to determine if listing the Horseshoe Crab was warranted, not warranted, or warranted but precluded. By bypassing the 90-day finding and making in essence a 12-month finding without engaging all interested parties, NOAA Fisheries failed to satisfy the 12-month status review criteria.

90. By making a 90-day negative finding based on numerous materials outside the four corners of the Horseshoe Crab petitions, NOAA Fisheries relied on factors which Congress has not intended it to consider and failed to consider an important aspect of the problem, which renders the negative finding arbitrary and capricious. NOAA Fisheries also acted contrary to the language of the ESA, rendering the action not in accordance with law.

### NOAA Fisheries arbitrarily sub-divided the Mid-Atlantic region to reject listing both the New York and Delaware Bay populations as a significant portion of the range.

91. The Center petition provided substantial information indicating that the Mid-Atlantic regional population of Horseshoe Crabs may be a significant portion of the range that warrants listing as threatened or endangered.

92. NOAA Fisheries arbitrarily sliced and diced the Mid-Atlantic regional population to make findings that (i) the New York sub-regional population is declining and listing may be warranted, but is not a significant portion of the range, and (ii) the Delaware Bay sub-regional population may be a significant portion of the range but does not warrant listing.

93.    The Center petition identified six "metapopulations" of Horseshoe Crabs. One metapopulation it identified is "Mid-Atlantic (USA)," which included "all embayments south of New Hampshire to and including North Carolina."

94.    NOAA Fisheries did not reject the six metapopulations as lacking credibility. In discussing Horseshoe Crab populations, NOAA Fisheries referenced eight regional units that closely aligned the Center's metapopulations, and that included "Mid-Atlantic (Massachusetts to North Carolina)." However, later in the negative 90-day finding, NOAA Fisheries further divided the Mid-Atlantic regional population, *and only the Mid-Atlantic*, into sub-regions. The new sub-regions included Mid-Atlantic: New England, Mid-Atlantic: New York, and Mid-Atlantic: Delaware Bay. Below depicts the Mid-Atlantic regional population as a whole on the left, and the Mid-Atlantic regional population divided into three sub-regions on the right.



*Source: Center for Biological Diversity*

23

95.    NOAA Fisheries did not give a reasoned explanation for sub-dividing the Mid-Atlantic regional population—and only the Mid-Atlantic—into multiple sub-regions. To the contrary, NOAA Fisheries identified a "high degree of relatedness" and movement between the Mid-Atlantic: New York and Mid-Atlantic Delaware Bay populations.

96.    After first identifying Mid-Atlantic: New York and Mid-Atlantic: Delaware Bay as "subregions," the negative 90-day finding then later switched terminology and referred to them as "regional populations"—i.e., the same descriptor it used for the eight regional units.

97.    Dividing the Mid-Atlantic regional unit into sub-regions enabled NOAA Fisheries to split the New York sub-region apart from the Delaware Bay sub-region and avoid considering them together as a significant portion of the range. This enabled NOAA Fisheries to find the New York sub-region to be in danger of extinction now or in the foreseeable future but not a significant portion of the range, while also acknowledging Delaware Bay may be a significant portion of the range.

98.    NOAA Fisheries did not consider whether the Mid-Atlantic region—with the New England, New York, and Delaware Bay sub-regions combined—is a significant portion of the range that may warrant listing.

99.    By splitting the Mid-Atlantic regional population into sub-regions, failing to explain why, and failing to consider whether the Mid-Atlantic regional population as a whole is a significant portion of the range, NOAA Fisheries failed to consider an important aspect of the problem, offered an explanation counter to the evidence before it, and acted contrary to the ESA.

### *NOAA Fisheries arbitrarily failed to consider whether to list Delaware Bay as a significant portion of the range.*

100.    The Center petition provided substantial scientific and commercial information indicating that Delaware Bay, either as part of a regional population or in and of itself, is a significant portion of the species' range that may warrant threatened or endangered listing.

24

101.    NOAA Fisheries erred in its analysis of whether the petitions provided substantial information indicating that the Delaware Bay population may be threatened or endangered.

102.    In the negative 90-day finding, NOAA Fisheries concluded that "Delaware Bay (*a component of the Delaware Bay regional population*) may be a significant portion of the species' range" (emphasis added).

103.    NOAA Fisheries defined the "Delaware Bay regional population" (i.e., the Mid-Atlantic Delaware Bay sub-region) as distinct from and broader than Delaware Bay—to include Horseshoe Crabs "along New Jersey, Delaware, Maryland, and Virginia coastlines (including the Delaware Bay)." A visual depiction of the two different geographic areas is below.



*Source: Center for Biological Diversity*

25

104.    NOAA Fisheries then concluded that the Center and Friends of Animals petitions presented no substantial information indicating that listing the "Delaware Bay regional population" may be warranted.

105.    However, NOAA Fisheries failed to make a finding specifically as to Delaware Bay, which is the portion of the range that the agency found may be significant.

106.    By failing to assess Delaware Bay alone as to whether that portion of the range warrants listing, NOAA Fisheries failed to consider an important aspect of the problem, offered an explanation that ran counter to the evidence before it, and acted contrary to the ESA.

### *NOAA Fisheries failed to consider whether the Gulf of Maine or Mexico Yucatán populations are a significant portion of the Horseshoe Crab's range.*

107.    NOAA Fisheries did not consider whether any populations outside of the Mid-Atlantic New York region and Delaware Bay are a significant portion of the species' range.

### *Gulf of Maine population*

108.    The Center petition provided substantial information for a reasonable person to find that listing the Gulf of Maine Horseshoe Crab population as a significant portion of the range may be warranted.

109.    In the negative 90-day finding, NOAA Fisheries noted a high degree of genetic differentiation detected between populations at the extremes of the Horseshoe Crab's range and the other regional population units. The Gulf of Maine population, as described in the Center petition, is at the northern extreme of the range.

110.    Yet NOAA Fisheries failed to consider whether the Gulf of Maine population is a significant portion of the Horseshoe Crab range.

111.    NOAA Fisheries also did not adequately consider whether the Gulf of Maine population, as a significant portion of the range, is in danger of extinction or will be in the foreseeable future.

26

112.    The Center petition provided substantial scientific and commercial information indicating that a reasonable person may find that the Gulf of Maine population may be in danger of extinction or will be in the foreseeable future. For example, the Center petition referenced the IUCN Red List's projection of 100 percent Horseshoe Crab population reduction in the Gulf of Maine if trends remain the same over 40 years. It also noted studies showing horseshoe crab spawning density is low across Maine, with three historical spawning sites no longer in use.

113.    In the negative 90-day finding, NOAA Fisheries acknowledged Smith et al. (2016, 2017) found the Gulf of Maine population to be "small and fragmented" and trending as "decreasing." The agency also referenced a Smith et al. (2023) study finding the "Gulf of Maine" population to be "functional"; in fact, that study also noted "environmental catastrophes could severely impact populations," found that recolonization of extirpated and depleted populations is unlikely, and concluded that "there is a high downside risk and low possible status (present) owing to small-population dynamics and habitat loss to [sea level rise] in an area with sparse and narrow spawning beaches."

114.    Despite the petition information and acknowledged trends about the Gulf of Maine population, NOAA Fisheries concluded that the Center petition failed to provide substantial information indicating that listing significant portions of the range may be warranted because it generally concluded there were "stable to increasing population trends" for all regional populations except the New York region.

115.    By failing to evaluate whether the Gulf of Maine population is a significant portion of the range in which listing as endangered or threatened may be warranted, NOAA Fisheries failed to consider an important aspect of the problem and acted contrary to the ESA.

*Yucatán, Mexico population*

116.    The Center petition provided substantial information indicating that listing the Yucatán region as a significant portion of the range may be warranted.

117.    In the 90-day finding, NOAA Fisheries noted a high degree of genetic differentiation detected between populations at the extremes of the Horseshoe Crab's range and the other regional population units. The Yucatán Peninsula is a regional unit at the geographic extreme of the range.

118.    NOAA Fisheries acknowledged materials in the Center petition showing that Mexico first recognized the Horseshoe Crab as being "in danger of extinction" in 1994. The Center petition also identified ongoing threats: coastal development causing the disappearance of nesting and nursing habitats; pollution degrading coastal water bodies, and; illegal harvesting (i.e., poaching) of Horseshoe Crabs use as bait in the octopus fishery.

119.    NOAA Fisheries dismissed these threats based on (i) one study's general finding that the Yucatán population is "most likely" to be "viable," (ii) that same study's suggestion that "sea-level rise *could* create new habitat" for Horseshoe Crabs based on an example of Horseshoe Crab spawning in Mexican coastal lagoons created from flooding wetlands, and (iii) that same study's speculative statement that unnamed "stakeholders in the Yucatán Peninsula octopus fishery" may create an industry sustainability certification with a goal of accessing international markets, and the potential certification might require avoiding use of Horseshoe Crabs as bait.

120.    NOAA Fisheries did not consider whether the Yucatán regional population is a significant portion of the Horseshoe Crab range.

121.    NOAA Fisheries also did not adequately consider whether the Horseshoe Crab in the Yucatán peninsula is in danger of extinction or will be in the foreseeable future.

28

122.    By failing to evaluate whether the Yucatán regional population is a significant portion of the range in which listing as endangered or threatened may be warranted, NOAA Fisheries failed to consider an important aspect of the problem and acted contrary to the ESA.

**The Center Gave Defendants Notice of this Lawsuit.**

123.    Pursuant to the ESA citizen suit provision, the Center gave the Secretary of Commerce, the Director of NOAA Fisheries, and NOAA Fisheries 60 days' notice of intent to sue for ESA violations on March 24, 2026, more than 60 days before filing this Complaint.

**<u>FIRST CLAIM FOR RELIEF</u>**

**Violations of the ESA.**

*NOAA Fisheries' negative 90-day finding is arbitrary, capricious, contrary to law, and without observance of procedure required by law.*

124.    The Center realleges and incorporates by reference the preceding paragraphs.

125.    Under the APA, a reviewing court "shall hold unlawful and set aside agency action, findings, and conclusions found to be arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law . . . [or] without observance of procedure required by law." 5 U.S.C. § 706(2)(A), (D). An agency's decision is arbitrary and capricious if the agency "has relied on factors which Congress has not intended it to consider" or "offered an explanation for its decision that runs counter to the evidence before the agency," among other reasons. *State Farm*, 463 U.S. at 43.

126.    NOAA Fisheries applied an improperly heightened standard when finding the Center petition did not present substantial information that listing the Horseshoe Crab may be warranted.

127.    Within 90 days after receiving a petition to add a species to ESA list, NOAA Fisheries "shall make a finding as to whether the petition presents substantial scientific or

commercial information indicating that the petitioned action *may be warranted*." 16 U.S.C.

§ 1533(b)(3)(A) (emphasis added). "If such a petition is found to present such information,

[NOAA Fisheries] shall promptly commence a review of the status of the species concerned." *Id*.

The standard for reviewing a petition at the 90-day stage is "whether a 'reasonable person' would

conclude that action 'may be warranted'"; it "does not allow the Service to simply discount

scientific studies that support the petition or to resolve reasonable scientific disputes against the

petition." *Buffalo Field Campaign*, 289 F. Supp. 3d at 109-110.

128.    The negative 90-day finding that the Center petition did not present substantial

information that listing the Horseshoe Crab may be warranted is unlawful. Under the 90-day

lower-threshold "reasonable person" standard, NOAA Fisheries must accept credible, substantial

information that supports the petitioners' positions.

129.    NOAA Fisheries disregarded and dismissed credible information in the Center's

petition that was sufficient for a reasonable person to find that the petitioned-for listing may be

warranted. NOAA Fisheries also favored studies and materials to pick a side in a debate in the

scientific community, which is improper at the 90-day finding stage. In essence, NOAA Fisheries

attempted to make a 12-month finding but did so without the requisite species status review and

public participation procedures.

130.    NOAA Fisheries also improperly considered and relied upon information beyond

the Center and Friends of Animals petitions.

131.    Within 90 days after receiving a petition to add a species to the threatened or

endangered lists, NOAA Fisheries "shall make a finding as to whether *the petition* presents

substantial scientific or commercial information indicating that the petitioned action may be

warranted." 16 U.S.C. § 1533(b)(3)(A) (emphasis added). "If *such a petition is found to present*

30

*such information*, [NOAA Fisheries] shall promptly commence a review of the status of the species concerned." *Id*. (emphasis added).

132.   After making a positive 90-day finding that the listing may be warranted, NOAA Fisheries may then seek additional data related to the subject of the petition through notice and comment. *Id*. § 1533(b)(5); *see also id*. § 1533(b)(6)(B)(i) (allowing agencies to extend one-year period after a 90-day finding "for purposes of soliciting additional data").

133.   In making the Horseshoe Crab negative 90-day finding, NOAA Fisheries relied on copious information from outside entities that was not included in the Center petition, including information that post-dated the petitions. By relying on third-party information beyond the four corners of the petitions, NOAA Fisheries bypassed the 90-day finding stage and proceeded to effectively a 12-month status review, but without the required public involvement opportunities.

134.   NOAA Fisheries' negative 90-day finding on the Center's petition to list the Horseshoe Crab is arbitrary, capricious, not in accordance with law, and without observance of procedure required by law, in violation of the ESA. *Id*. § 1533; 5 U.S.C. § 706(2)(A), (D).

<u>**SECOND CLAIM FOR RELIEF**</u>

**Violations of the ESA.**

*NOAA Fisheries' finding that the petitions did not provide substantial information indicating that the Horseshoe Crab may be threatened or endangered in a significant portion of its range is arbitrary, capricious, and contrary to law.*

135.   The Center realleges and incorporates by reference the preceding paragraphs.

136.   A species is "endangered" if it is "in danger of extinction throughout all *or a significant portion of its range,"* and "threatened" if it "is likely to become an endangered species within the foreseeable future throughout all *or a significant portion of its range*." 16 U.S.C. § 1532(6), (20) (emphases added).

31

137.    Accordingly, NOAA Fisheries must ask whether any portions of the Horseshoe Crab range in which the species' status may warrant listing as threatened or endangered.

138.    NOAA Fisheries concluded that the Center petition did not provide substantial information indicating that the Horseshoe Crab may be threatened or endangered throughout a significant portion of its range because "most regional populations are considered to be stable or increasing with the exception of the New York regional population," and there is nothing "to suggest that the New York regional population is a significant portion of the species' range." This conclusion was arbitrary and capricious and contrary to law.

139.    NOAA Fisheries also acted arbitrarily, capriciously, and contrary to law when without reasoned explanation it split the Mid-Atlantic: New York regional Horseshoe Crab population apart from the Mid-Atlantic: Delaware Bay population to avoid considering the Mid-Atlantic regional population as a significant portion of the range and to conclude that the depleted New York sub-region is not a significant portion of the range.

140.    NOAA Fisheries' finding was also arbitrary, capricious, and contrary to law because the agency failed to consider whether the Delaware Bay Horseshoe Crab population—a population that NOAA Fisheries concluded may be a significant portion of the range—may be threatened or endangered.

141.    NOAA Fisheries also unlawfully failed to analyze whether the Gulf of Maine and Mexico Yucatán regional population portions of the Horseshoe Crab's range—where it faces increased risks of extinction—are either independently or together a significant portion of the range.

142.    Accordingly, NOAA Fisheries' negative 90-day finding violates the ESA and is arbitrary, capricious, an abuse of discretion, and otherwise not in accordance with the law. *Id*. § 1533; 5 U.S.C. § 706(2)(A).

## REQUEST FOR RELIEF

The Center respectfully requests that this Court:

1. Declare that NOAA Fisheries' negative 90-day finding for the Horseshoe Crab violates the ESA and the APA;

2. Vacate NOAA Fisheries' negative 90-day finding;

3. Order Defendants to make a new 90-day finding by a date certain;

4. Retain jurisdiction to ensure compliance with all judgments and orders;

5. Award the Center its reasonable attorneys' fees, costs, and expenses, as provided by the ESA, 16 U.S.C. § 1540(g); and

6. Grant the Center further and additional relief the Court may deem just and proper.

DATED: May 28, 2026                     Respectfully submitted,

 */s/ Daniel H. Waltz*
Daniel H. Waltz (D.D.C. Bar No. D00424)
CENTER FOR BIOLOGICAL DIVERSITY
1411 K Street NW, Suite 1300
Washington, DC 20005
Phone: (303) 880-9136
dwaltz@biologicaldiversity.org

William J. Snape, III (D.C. Bar No. 455266)
AU WCL
4300 Nebraska Avenue NW
Washington, DC 20016
wsnape@wcl.american.edu

Brian Segee (Cal. Bar No. 200795)*
CENTER FOR BIOLOGICAL DIVERSITY
226 W. Ojai Ave., Ste. 101-442
Ojai, CA 93023-3278
Phone: (805) 750-8852
bsegee@biologicaldiversity.org

*Pro hac vice application forthcoming*

*Attorneys for Plaintiff Center for Biological Diversity*

33